ELLIS, Judge.
The plaintiff filed suit August 10, 1959 for workmen’s compensation benefits for total and permanent disability together with penalties and attorney’s fees, alleging he suffered certain injuries on September 5, 1958 resulting in his being unable to return to his former occupation. Plaintiff admits he was paid $24.38 per week for 26 and one-half weeks.
The defendants answered admitting the plaintiff was employed by them, and reported an injury on the job, and he was sent to several doctors, all of whom discharged him by December 16, 1958, but defendants continued to pay him compensation until March 9, 1959 when a Dr. Paul Cashio of Covington reported that his medical examination was negative for any disability resulting from the accident. Defendants deny plaintiff suffered any permanent disability from the accident beyond the time for which compensation was paid to him, alleging they stopped payment of compensation upon the advice of a competent physician.
The case was duly tried on February 27, 1961 and judgment with oral reasons rendered February 19, 1962 rejecting the plaintiff’s demands at his costs. Motion for a new trial was timely filed and overruled on May 23, 1963, whereupon plaintiff obtained a devolutive appeal to this court.
Since the plaintiff has set forth in his petition that the defendants had not paid the full amount of compensation due, we will consider this at the outset of this opinion. By the plaintiff’s own testimony he was making $36.00 per week. He was not being paid on an hourly basis and he was therefore entitled to 65% of the weekly amount or $23.40 which he was paid.
The plaintiff was hurt while he was on the job on September 5, 1958 in the course and scope of his employment when he fell from the top of a tractor portion of a tractor-trailer, while attempting to start a small gasoline engine located on top of the tractor. The rope plaintiff was usingbroke causing him to fall approximately eight feet to the ground.
The record reflects plaintiff suffered a stroke on February 5, 1959. He was admitted to the Flint-Goodridge Hospital in New Orleans on March 13, 1959 and discharged therefrom on April 1, 1959. He was unable to stand without support at the time he was in the hospital, and was unable to do any type of work whatsoever. The sole issue is whether the plaintiff’s injury from the fall he sustained on September 5, 1958 was in any way connected with the resulting disability which the plaintiff suffered at the time he was hospitalized in March of 1959. In order to determine this, we shall review the medical testimony found in the record.
The plaintiff was first examined on September 6, 1958 by Dr. Edmond Faulken-berry. At this time the plaintiff complained mainly of pain in his left shoulder. The doctor diagnosed plaintiff’s injury as contusion of the left shoulder and chest as a result of the fall. It was Dr. Faulken-berry’s opinion that the plaintiff had no permanent disability. He was given sedation and straped in his thoracic region. Although not completely free from pain, the doctor felt the pain was not sufficient to prevent him from being able to do light work, and he discharged him on October 22, 1958.
On October 17, 1958 the plaintiff was examined by Dr. Collins Lipscomb. The plaintiff voluntarily went to the doctor, complaining of soreness of the breastbone and in the left upper quadrant, with a swelling and bloating in that area. Plaintiff’s chief complaints at that time were in his abdomen, lower part of his chest and the lower part of his abdomen. Dr. Lipscomb was of the opinion that the pains were caused by his injury, and he requested plaintiff be sent to a specialist for an examination and diagnosis. Plaintiff *515 continued to see the doctor and went to his office on November 13th, 18th and almost daily thereafter for treatment until December 16, 1958. Dr. Lipscomb gave the plaintiff a form of deep heat therapy to his abdomen and the lower part of his chest. On December 16, 1958 he discharged plaintiff since he did not feel he needed further treatment for the injury at that time, although he did suggest plaintiff seek treatment for his high blood pressure.
On November 18, 1958 Dr. J. A. Sabatier rendered a report to Dr. Lipscomb after examining the plaintiff and making his diagnosis. In taking the plaintiff’s history, Dr. Sabatier found plaintiff’s original symptoms of pain were in his left arm and in the left chest area which was strapped by Dr. Faulkenberry. After removing the tape the plaintiff noticed discomfort in the lower abdomen, which, incidentally, were his chief complaints to Dr. Lipscomb. These symptoms complained of were decreasing somewhat in intensity during the last week or so, presumably because of the treatment rendered by Dr. Lipscomb. On examining the plaintiff, Dr. Sabatier found tenderness in his left lower abdomen in its lower one-half. He could not localize the tenderness, finding that there seemed to be a certain amount of voluntary muscle spasm. The doctor could find no significant abnormality on neurological examination, and was unable to find any objective evidence of abnormality attributable to the trauma sustained in September. Dr. Sabatier found also hypertensive cardio-vascular disease and stated he did not believe this had any causal relationship to the injury nor did the injury aggravate the disease.
The next doctor to testify was Dr. J. W. Scott, who stated he saw the plaintiff from 1958 until December of 1960. Dr. Scott had misplaced the plaintiff’s records and only had a record dated November 1959 and from there he reconstructed the plaintiff’s records with his wife. There was no testimony whatsoever on the part of Dr. Scott that he found any causal connection between the plaintiff’s injury and his high blood pressure although he stated in a general sense a person with high blood pressure having an accident would temporarily elevate the high blood pressure and could possibly increase his chances for having a stroke. Most specifically, Dr. Scott testified under cross examination if the man did have high blood pressure and suffered an accident, the stroke more than likely would have taken place shortly after the fall, within a matter of several days.
On March 9th, according to the defendant’s answer, they sent the plaintiff to Dr. Paul Cashio in Covington, Louisiana. After running a G. I. series, Dr. Cashio found the tests were negative. On the basis of this report, the defendants discontinued compensation payments to the plaintiff.
Chronologically, the next medical evidence we find in the record is in the hospital records of the Flint-Goodridge Hospital. The history was taken on March 13, 1959, the date of plaintiff’s admission to the hospital. Plaintiff complained of pains in the lower abdomen and was still in pain although he was treated by several doctors. On February 5, 1959 he had suffered a stroke and at that time his entire left side was severely weakened. He gradually improved from these conditions but was still unable to walk. At that time the plaintiff’s blood pressure was 130/90. Dr. William Fisher took plaintiff’s history and apparently was the admitting physician.
The plaintiff continued to complain of pain and lumps in his lower abdomen but because the examination revealed no hernial defects or probable masses, Dr. Fisher thought the pain might be due to radiation from lower lumbar vertebral areas and at that time requested consultation from Dr. Richard Levy and Dr. Haslem, a neurosurgeon and an orthopedist, respectively. The plaintiff was given a G. I. series which was found to be essentially normal. The x-rays revealed no evidence of any old rib fractures but there was some degenera *516 tive arthritis and bearing of the spaces of L4 and L5. He was then given extensive roentgenologic and fluoroscopic tests. The tests on plaintiff’s thoracic spine were negative. Insofar as the cervical spine was concerned the tests revealed marked degenerative arthritis with narrowing of the discs. The tests of the left shoulder were negative. The tests of the chest area were negative, and those of the lumbar spine revealed there was degenerative arthritis of most of the lumbar discs, particularly narrowing at the fourth lumbar disc.
Dr. Richard Levy sent Dr. Fisher a report after examining the plaintiff on March 20, 1959. His impression of the plaintiff was that he could not find a neurological residual attributable to the injury sustained as a result of the fall on September 5, 1958, and did not feel it was a causal relationship between the fall and the cerebro-vascular accident occurring five months thereafter. Dr. Haslem’s report and consultation at the request of Dr. Fisher reveals that although the plaintiff had considerable hypertrophic arthritis in his spine he was not convinced this was the cause of his abdominal pain.
Dr. Levy’s deposition indicates he felt the plaintiff’s accident might have had an immediate effect on the blood pressure rather than a lasting one. It was Dr. Levy’s impression that the plaintiff’s neurological functions were compatible with and related to the stroke which he suffered according to the history given him on February 5, 1959. Although the doctor found the plaintiff did have a weak left shoulder he felt any weakness was attributable to the stroke, particularly when considered with the other findings, weakness in the left side, increased reflexes in the left side, stiffness of the left arm and left leg, a slight loss of feeling to the pin prick in the left arm and left leg. It was the doctor’s impression that all of these were findings common to a stroke.
Dr. Haslem was examined by deposition and testified he examined the plaintiff on March 21, 25, and 29th, 1959. He examined the plaintiff in the Flint-Goodridge Hospital and was not able to give the plaintiff a complete orthopedic examination because he was bed ridden. He had to limit his examination to what could be found in a sitting and lying position. The plaintiff told Dr. Haslem he was not able to walk since the 5th of February but that he was able to take a few steps with assistance at the time he was examined by the doctor. The significant portions of Dr. Haslem’s testimony we quote as follows, to-wit:
“Q. Doctor, what were your findings as a result of the examination; what conclusion did you arrive as to this man’s general physical condition?
“A. I think I should — I felt that although this man had considerable hypertrophic arthritis in his spine, that I didn’t think that this was the cause of abdominal pain of which he was complaining; I felt that the physical findings were consistent with him having had a small stroke or cerebral vascular accident; and that the ad-ductor muscle spasm in his left hip was due to this. I didn’t feel he had enough impairment in his left lower extremity to prevent him from walking. He certainly had a significant degree of stiffness in his left shoulder, but I wasn’t certain as to the cause for this. This certainly could have been due to an injury he described wherein he, as I understood it, fell on the left shoulder or the stiffness in the left shoulder could have developed spontaneously here because of the arthritic changes in his neck or sub-acrominal bursitis or the stiffness could have developed because of disuse and weakness following his stroke. The muscle spasm in his back, being on the left side didn’t necessarily mean that he was having pain in his back from the arthritis as it would in a person who hadn’t had the stroke since the stroke in itself could produce the muscle spasm in his back. * * * ”.
*517 Dr. Haslem was not able to determine with that degree of legal certainty or by a preponderance of the evidence, that the plaintiff’s symptoms and his diagnosis of these symptoms at the time he was hospitalized was due to the accident. He felt that there were too many possible causes that could independently or collectively cause plaintiff’s trouble.
A significant factor brought out by all of the doctors was that none of them could find a causal connection between the accident and the stroke. Had the accident caused the stroke it would have manifested itself within a few days of the accident rather than five months later.
The plaintiff was also examined by Dr. R. E. Dupre. His examinations were made so much later than the other doctors that they cannot be entitled to much weight. Dr. Dupre found a right inguinal hernia on November 7, 1959 but related no causal connection to the injury.
The plaintiff urges that the defendants must take the plaintiff as they find him and if a dormant condition is aggravated, then the resulting disability is compensable. Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, 590, L.R.A.1918F, 862 (1918), Guillory v. Reimers-Schneider, La.App., 94 So.2d 134, 136 (1st Cir.1957), Rainwater v. Timothy, La.App., 87 So.2d 11, 13 (or 11956), Washington v. Atlantic & Gulf Stevedores, La.App., 85 So.2d 714, 716 (Or.1956) and Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625, 627 (1940).
In the case at bar there is no positive or preponderant medical testimony that the plaintiff’s disability at the time of the trial was related in any way to his injury.
We find no such testimony in the case at bar and therefore find no medical evidence connecting his disability at the time of the trial to the accident. The medical evidence preponderates that the stroke was unquestionably unrelated to the accident.
We cite the case of Bellard v. Liberty Mutual Ins. Co., La.App., 150 So.2d 624, and quote the following, to-wit:
“ ‘The Court must be guided by the rule which is authoritatively stated in the case of Carl Waters v. L. L. Brewton Lumber Company, Inc. (La.App.), 120 So.2d 842, quoted as follows:
“ ‘ “The rule is well established, notwithstanding the liberality enjoined upon the courts as to procedure and evidence in compensation cases, that a claimant, in order to recover, must establish with reasonable certainty, by a preponderance of evidence, that he is not only disabled, but that such disability resulted from accidental injuries sustained within the course and scope of his employment” ’ ” (See cases cited)
Although the plaintiff argues that the lay testimony should be considered since the medical evidence was in substantial conflict and cites Gunther v. Stracham Shipping Co., La.App., 85 So.2d 543, we do not, however, subscribe to the plaintiff’s analysis of the medical testimony as we find the medical to be in substantial agreement, therefore this rule does not apply.
The plaintiff last seeks a remand for the purpose of obtaining additional medical if we cannot decide the case on the evidence submitted. We cannot see any useful purpose in a remand since the plaintiff was examined by the numerous doctors whose testimony or reports are analyzed in detail above. The diagnoses and opinions of physicians who examined and treated plaintiff soon after his accident would be entitled to greater weight than doctors examining him some six years later.
For the reasons above given the judgment is affirmed.
Affirmed.