646 So.2d 330 (1994)
Austin MILLER
v.
ROGER MILLER SAND, INC. and Cigna Property and Casualty Insurance Co.
No. 94-C-1151.
Supreme Court of Louisiana.
November 30, 1994.
*332 Michael B. Miller, Crowley, for applicant.
Benjamin W. Mount, Thomas J. Gayle, Berstedy & Mount, Lake Charles, for respondent.
MARCUS, Justice[*].
Austin Miller (Miller), an employee of Roger Miller Sand, Inc. (Miller Sand), fell into a ditch while working at a sand pit, injuring his shoulder. At the time of his fall, Mr. Miller was 73 years old, and had worked for Miller Sand for approximately two and a half years. His work responsibilities included heavy manual labor, such as shoveling sand from beneath conveyor belts and gathering and carrying away buckets of roots and rocks and other debris filtered from the sand. Miller's work responsibilities also included operating a front end loader and working in the scale house completing weight tickets.
On the day of his injury, February 4, 1991, Miller and a co-worker, Ralph Chaisson, who was also Miller's supervisor on this job, were attempting to clear a ditch to unclog a drainage pipe. Chaisson operated a front end loader to dig out the ditch, while Miller attempted to go down into the ditch to dig. Miller fell into the ditch approximately ten to 15 feet down, landing on his shoulder and back. He continued to work after the fall, and did not report the accident to the company owner, Roger Miller, until a few days later. Roger Miller testified that when Miller told him about the fall, he told Miller to either go home or go see a doctor. Miller responded that he was alright, and could stay and work. However, Miller could not function at work as he had before the fall. According to Miller, he was having trouble moving his shoulder, and could hardly use a shovel. In fact, Chaisson testified that, after the accident, Miller "couldn't hardly put his forearm on the table," and "couldn't hardly make out a weight ticket." In addition, Roger Miller testified that Miller was having difficulty even lifting his right arm.
Miller continued to work for Miller Sand, working in the scale house writing weight tickets, until March 31, 1991, when he was terminated. Roger Miller stated that Miller was terminated due to "lack of work," while at the same time admitting that it was also because Miller "wasn't capable of doing his job." In fact, in a letter reporting the work-related fall to the Office of Worker's Compensation, the company secretary, Yvonne Miller, wrote: "Austin Miller was terminated by Roger Miller, because work was slow and Austin was showing signs of being incapable of carring [sic] out his duties." Notwithstanding Miller's termination and this letter, neither Miller Sand nor its insurer, Cigna Property and Casualty Insurance Co. (Cigna), initiated worker's compensation disability payments to Miller following his March 31, 1991 termination.
Subsequent to his termination, Miller saw Dr. Lester Ancelet, his regular physician, on April 26, 1991, who determined that Miller sustained injuries to his right shoulder as a result of the work-related fall. Specifically, Miller's supraspinatus tendon, which is a tendon that facilitates motion of the arm in the shoulder region, had been torn, and this injury was superimposed on an existing arthritic condition. Dr. Ancelet stated that "the shoulder just had reached a point of just about complete loss as far as rotation and elevating the elbow." The doctor also determined *333 that Miller had sustained a serious stroke sometime after his work-related accident and after he was terminated by Miller Sand. Dr. Ancelet stated that this stroke contributed to Miller's disability. Upon questioning regarding the effects of the shoulder injury, disregarding the effects of the stroke, Dr. Ancelet stated in his deposition: "I don't think he could work. I don't think he could work with that type of injury." Upon specific questioning regarding whether Miller could return to the type of work he was doing before the accident, Dr. Ancelet stated, "he wouldn't be able to do manual labor." He also stated that, while the stroke was responsible for the disability to Miller's hand and fingers, the tear in his tendon caused by the fall at work completely prevented Miller from rotating his arm, and from lifting above the elbow.
Dr. Ancelet referred Miller to Dr. Thomas Ford, an orthopedic surgeon, for further evaluation of his shoulder. Dr. Ford, who first saw Miller on May 10, 1991, confirmed that Miller had sustained a tear in his supraspinatus tendon in his right shoulder (also referred to as a torn rotator cuff muscle) which was consistent with the fall Miller described, and that Miller also had a fairly significant underlying arthritic condition. Dr. Ford testified in his deposition that the stroke affected Miller's right side and that it was "impossible to separate" the pain and disability to Miller's arm caused by the torn rotator cuff muscle from that caused by the stroke. In addition, Dr. Ford testified that, due to the stroke, surgical repair of Miller's torn rotator cuff muscle was not a viable option. Furthermore, Dr. Ford stated that Miller's underlying degenerative arthritis also reduced the chance of successful surgical intervention of the rotator cuff tear, noting that Miller would probably still have shoulder pain. As a result, Dr. Ford began a conservative treatment of the rotator cuff tear with anti-inflammatory injections, which did not work very well to relieve Miller's pain.
Although Dr. Ford repeatedly professed an inability to separate the effects of the rotator cuff tear from those of the stroke, upon questioning he stated that, without the stroke, and without surgical intervention, he would not allow a 70 year old man with a torn rotator cuff muscle and an arthritic condition to return to the performance of manual labor. He also estimated an "ordinary elderly person['s]" disability without the stroke, but with surgical intervention in the following exchange with defense counsel:
Q: So, if we take a man who has an arthritic condition, sustains a rotator cuff tear, is elderly, is able to undergo surgical intervention, in medical probability could he return to some type of gainful employment in approximately four months?
A: Yes. (Emphasis added.)
Dr. Ford qualified this statement, however, by acknowledging that this ordinary elderly person will have "some continuing disability," and did not testify regarding what type of employment this person could return to, or if such employment was even available. Furthermore, he stated that some people are unable to return to work at all, because the surgery is not successful.
Miller Sand's worker's compensation insurer, Cigna, received notification of Miller's claim on May 9, 1991, and began paying Miller's medical expenses. Cigna also sent Miller to Dr. L. Lazaro for further medical evaluation. In his report, Dr. Lazaro stated that, while it is "extremely difficult" to separate the effects of the rotator cuff tear from those of the stroke, it was his opinion that:
As all things being equal if this gentleman had nerve[1] [sic] had a CVA [stroke] and at age 73 had sustained a supraspinatus tear with the resultant loss of motion that he has superimposed upon the arthritic change and the discomfort that he complains of in the shoulder area, I would assign him a 55% to 65% impairment to the shoulder.
However, notwithstanding this report, as well as the opinions of the other medical experts, Cigna did not pay Mr. Miller any disability benefits. As a result, Miller brought this worker's compensation action against Miller Sand and Cigna. After a hearing, the hearing *334 officer made the following factual findings:
1) Claimant, at 73 years old, suffered a compensable work-related injury on February 4, 1991, falling 10 to 15 feet into a ditch, from which he suffered a substantially torn rotator cuff in his shoulder.
2) Claimant continued to work for defendant-employer until March 31, 1992,[2] at which time his employment was terminated.
3) Claimant suffered a stroke shortly thereafter, in the middle of April, 1991.
4) Claimant's February 4th work-related injury was disabling, rendering him unable to perform his pre-injury job duties. This finding is consistent with Drs. Lester Ancelet, Thomas Ford, and L. Lazaro.
5) Claimant could have returned to some form of work, or would have been capable thereof, after surgery to repair the rotator cuff, but the stroke had precluded claimant as a surgical candidate (Dr. Ford's deposition).
6) The stroke suffered in mid-April, 1991 would have rendered claimant totally disabled, regardless of the work-related accident.
The hearing officer also found that there was no evidence that the work-related accident caused or contributed to the stroke. Based on these findings, the hearing officer determined that Mr. Miller was entitled to disability benefits only until he suffered the disabling stroke, from April 1, 1991 to April 15, 1991. The hearing officer terminated benefits on the date the stroke occurred, finding that the stroke is the reason Miller is permanently disabled, not the work-related fall. The hearing officer also denied Miller's claim for penalties and attorney's fees.
The court of appeal, sitting in a five judge panel with two judges dissenting, affirmed in all respects except it extended the period during which disability benefits were due to four months (from April 1, 1991 to July 31, 1991), and it ordered defendants to continue to provide Miller with all medical care necessary to treat his torn rotator cuff muscle.[3] Upon Miller's application, we granted certiorari to review the correctness of that decision.[4]
The issues presented for our consideration are whether Miller is totally and permanently disabled due to his work-related accident, or, if not, whether he is entitled to supplemental earnings benefits, and finally, whether defendants are liable for penalties and attorney's fees.
An employee in a worker's compensation action has the burden of establishing a causal link between the work-related accident and the subsequent disabling condition. Peveto v. WHC Contractors, 93-1402 (La. 1/14/94); 630 So.2d 689, 691. In the present case, the evidence clearly supports the hearing officer's determination that plaintiff's ten to 15 foot fall into a ditch while at work in February 1991 caused the rotator cuff tear in his right shoulder. The evidence is also clear that the stroke plaintiff suffered on April 15, 1991 is an unrelated medical event[5] which worsened plaintiff's condition, and rendered him completely and totally disabled. However, the mere fact that the stroke, and not the work injury, rendered plaintiff totally disabled does not negate the fact that the work injury left plaintiff with some form of disability. While Miller Sand is not required to pay for the increased disability caused by plaintiff's subsequent non-work-related stroke,[6] *335 Miller Sand must pay for the disability caused by plaintiff's work-related fall. The hearing officer was clearly wrong to terminate disability payments due to the stroke. Therefore, in order to determine if plaintiff is entitled to continuing disability payments, we must determine the extent of his disability caused by the work-related fall, giving no consideration to any additional disability caused by the stroke.
Our review of the medical testimony and other evidence leads us to the conclusion that plaintiff has proven by a preponderance of the evidence that he is unable to return to his former employment as a result of his rotator cuff tear, combined with his underlying arthritic condition. The evidence does not, however, support plaintiff's claim that he is totally and permanently disabled as a result of the fall. In order to prevail on such a claim:
[T]he employee [must] prove[] by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment. (Emphasis added.)
La.R.S. 23:1221(2)(c). Plaintiff has failed to meet this exacting burden of proof because he has failed to prove by clear and convincing evidence that his work-related injury precludes him from engaging in any type of employment. Furthermore, the medical evidence establishes that, although plaintiff is currently totally disabled, that condition is due to the increased disability caused by his stroke, and not solely to his fall.
The evidence does, however, support plaintiff's claim for supplemental earnings benefits, the requirements for which are set forth in La.R.S. 23:1221(3).[7] In order to prevail on such a claim, the injured employee must prove by a preponderance of the evidence that the work-related injury has resulted in his or her inability to earn wages equal to ninety percent or more of the wages he or she was earning at the time of the injury. Peveto, 630 So.2d at 692-93; Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989). Once the plaintiff has met *336 this initial burden of proving entitlement to supplemental earnings benefits, the burden of proof shifts to the employer if it wishes to prove the employee is earning less than he or she is able to earn. The employer bears the burden of proving that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in the employee's or the employer's community or reasonable geographic region. Daigle, 545 So.2d at 1008-09.
We find that plaintiff has carried his initial burden of proof. Three medical doctors examined plaintiff, and each one concluded that he could not return to his former occupation, which entailed manual labor, or that he was significantly disabled, due solely to the injury caused by the work-related fall, ignoring the effects of the stroke. Dr. Ancelet testified not only that plaintiff is unable to perform manual labor, but that he could not work at all with that type of injury. Dr. Lazaro testified that plaintiff's shoulder impairment is 55% to 65%. Finally, Dr. Ford testified that, without surgical intervention, plaintiff would be unable to perform manual labor. Even Dr. Ford's testimony assuming surgical intervention would only return an average elderly person to some sort of employment after four months. Moreover, Dr. Ford acknowledged that some such surgeries are not successful, and even when they are, some form of disability usually remains, particularly when the patient has an underlying arthritic condition. Based upon the foregoing, we conclude that plaintiff has clearly shown that he is unable to earn ninety percent or more of his pre-injury wages due solely to his fall at work, ignoring the effects of the stroke.
Since plaintiff has met his initial burden of proving entitlement to supplemental earnings benefits, the burden of proof switches to the employer, Miller Sand, to prove that, had Miller not suffered the stroke, he would have been physically able to perform a certain job and that the job would have been offered to plaintiff or available to him in his or Miller Sand's community or reasonable geographic region. We find that Miller Sand has failed to meet its burden of proof. Miller Sand has not only failed to prove that plaintiff would have been physically able to perform a certain job, it has also failed to prove that any specific jobs would have been available to plaintiff. Miller Sand did not identify any employment opportunities which would have been available to plaintiff. To the contrary, the plaintiff presented deposition testimony of a vocational rehabilitation counselor, Jeffrey Peterson, indicating that plaintiff is not currently employable, considering the effects of the work-related accident and not the stroke, as well as plaintiff's age and limited education. Peterson stated: "For all practical purposes, the only jobs that we were able to find would be some very minimal jobs at a light occupational level, and these jobs generally do not exist in any significant numbers, at least especially in this local economy." Peterson also testified that he "would not advise retraining or any remedial education at this point" because of plaintiff's age and limited education.
Based on the foregoing, we find that plaintiff has proven by a preponderance of the evidence that, due to his fall at work, he is unable to earn ninety percent or more of his pre-injury wages. In addition, Miller Sand has failed to rebut this evidence by failing to prove that plaintiff would have been employable had he not suffered the stroke. Therefore, plaintiff is entitled to supplemental earnings benefits. The court of appeal erred in terminating Miller's disability benefits on July 31, 1991.
Plaintiff also claims he is entitled to statutory penalties and attorney's fees from defendants due to their failure to pay him any disability benefits. Statutory penalties shall be awarded if the employer or insurer fails to pay supplemental earnings benefits to the claimant within fourteen days after the employer or insurer has knowledge that compensable supplemental earnings benefits are payable, unless (1) such nonpayment results from conditions over which the employer or insurer has no control, or (2) the employer or insurer has reasonably controverted the employee's right to such compensation or medical *337 benefits. La.R.S. 23:1201.[8] Defendants do not claim, nor do the facts support the argument that disability benefits were not paid for reasons beyond the employer's or insurer's control. Therefore, we must determine whether the employee's right to disability benefits has been reasonably controverted by the employer or insurer. We find that it has not. Neither party disputes that Miller suffered a work-related fall, and the evidence is clear that Miller's torn rotator cuff resulted from this fall. In fact, there is evidence that one of the reasons Miller's employment was terminated was because he was no longer able to perform his job as a result of the injuries he sustained in this fall. Additionally, all three medical experts stated that Miller was unable to return to his former occupation, or was significantly disabled, due to his work-related fall alone, ignoring the effects of the stroke. Even Dr. Ford's testimony assuming surgical intervention estimated that an average elderly person would be unable to work for four months after the surgery, and even then would only be able to return to some form of employment. Although confronted with this evidence, defendants failed to pay any disability benefits to Miller. Based on the foregoing, we find that Miller's right to supplemental earnings benefits has not been reasonably controverted. Clearly, defendants had "knowledge" that supplemental earnings benefits were due after completion of all medical depositions and reports and the rehabilitation counselor's deposition. Since defendants have failed to pay any disability benefits, they are liable for penalties.
Reasonable attorney's fees may be awarded if the insurer fails to pay the amount of any claim due within 60 days after receipt of written notice, and such failure is arbitrary, capricious, or without probable cause. La.R.S. 23:1201.2.[9] As we previously noted, Cigna does not dispute that Miller's fall was work-related. Yet, Cigna did not even initiate disability benefits based on its assertion that it was unable to distinguish the extent of Miller's disability attributable to this fall from that attributable to the stroke. However, Cigna admitted that it never received the actual medical depositions of Drs. Ancelet and Ford, but only summaries of them prepared by defense counsel. Our review of the medical and other evidence discloses ample support for plaintiff's claim that he is unable to return to his former occupation due to his work-related fall alone, ignoring the effects of the stroke. Based on the foregoing, we find that Cigna's refusal to pay disability benefits to Miller was arbitrary, capricious, and without probable cause. Cigna received initial notification of Miller's claim on May 9, 1991, followed by summaries of the medical depositions and reports, and the rehabilitation counselor's deposition. Since Cigna has failed to pay any disability *338 benefits, it is liable for reasonable attorney's fees.
In sum, plaintiff is entitled to supplemental earnings benefits together with penalties and attorney's fees. We remand the case to the hearing officer to fix the amount of supplemental earnings benefits and penalties, to determine the amount of attorney's fees, and to enter a proper judgment.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed insofar as it terminated disability benefits on July 31, 1991, and denied the award of penalties and attorney's fees. The judgment is amended to award supplemental earnings benefits, together with legal interest on each past due payment until paid, plus penalties and attorney's fees. The case is remanded to the hearing officer to fix the amount of supplemental earnings benefits and penalties, to determine the amount of attorney's fees, and to enter a proper judgment. The judgment of the court of appeal is affirmed insofar as it ordered defendants to continue to pay medical expenses associated with Miller's work-related shoulder injury. Defendants are assessed with all costs of these proceedings.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
Although in agreement with the majority's treatment of this case, I write separately in order to emphasize that "[c]ausation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence." Haughton v. Fireman's Fund American Ins. Cos., 355 So.2d 927, 928 (La. 1978).
As Professor Malone has noted:
The function of the judge is much broader than that of the medical man, for loss of earning capacity, which is the eventual touchstone of all legal definitions of disability, can be determined only by reference to the state of the labor market, hiring practices, the humanity of obliging a man to work in pain, and other broad policy considerations which the physician is neither equipped nor authorized to evaluate.
Consequently, the court may properly find that a worker is totally disabled although the medical witnesses are in substantial agreement that the disability is only twenty or thirty percent ...
Haughton, supra, citing Malone, Louisiana Workmen's Compensation, § 272 (Supp. 1964).
With this precaution, I join in the majority's disposition of this case.
NOTES
[*] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994. Lemmon, J., not on panel. Rule IV, Part 2, § 3.
[1] "Nerve" should be "never."
[2] This date is an obvious error. The evidence shows that Miller actually worked until March 31, 1991, not 1992.
[3] 93-252 (La.App. 3d Cir. 2/9/94), reh'g denied; 632 So.2d 1176.
[4] 94-1551 (La. 7/1/94); 639 So.2d 1179.
[5] Plaintiff has conceded throughout this litigation that the stroke has no causal relation to his work-related shoulder injury.
[6] See Haughton v. Fireman's Fund American Ins. Cos., 355 So.2d 927, 929 (La.1978), where this court stated: "If an accident causes a disability from which a workman would have recovered except for further disability produced by a separate, intervening cause, there is no liability for compensation beyond the disability produced by the job connected accident." See also Schernbeck v. Argonaut Ins. Co., 212 So.2d 742 (La.App. 4th Cir.1968) (plaintiff not entitled to recover for extended disability period caused by stroke which occurred subsequent to and was unrelated to work injury); Pierre v. Sledge Townsend Feed & Seed Store, 165 So.2d 513 (La.App. 1st Cir.1964) (same).
[7] La.R.S. 23:1221(3) provides in relevant part:

Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
. . . . .
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety per cent [sic] or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region. (Emphasis added.)
[8] La.R.S. 23:1201, which governs the award of statutory penalties, provides in relevant part:

C. Installment benefits payable pursuant to R.S. 23:1221(3) shall become due on the fourteenth day after the employer or insurer has knowledge of the compensable supplemental earnings benefits on which date all such compensation then due shall be paid.
. . . . .
E. If, pursuant to this Chapter, any compensation or medical benefits payable without an order is not paid within the time period provided in Subsection B, C, or D of this Section, there shall be added to such unpaid compensation a penalty of an amount equal to twelve percent thereof or a total penalty of not more than fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid, whichever is greater, which shall be paid at the same time as, and in addition to, such compensation, unless such nonpayment results from conditions over which the employer or insurer had no control.... Whenever the employee's right to such compensation or medical benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply. (Emphasis added.)
[9] La.R.S. 23:1201.2, which governs the award of attorney's fees, provides in relevant part:

Any insurer liable for claims arising under this Chapter, and any employer whose liability for claims arising under this Chapter is not covered by insurance, shall pay the amount of any claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim.... (Emphasis added.)