L MURRAY, Judge.
National Gypsum Company appeals the award of workers’ compensation benefits, penalties and attorney fees, to its former employee, Francis V. Harris. We affirm for the reasons that follow.
FACTS AND PROCEEDINGS BELOW
Mr. Harris was born in December 1935 and completed an eighth-grade education plus vocational training at Delgado Trade School. He began work as a mechanic at National Gypsum’s New Orleans plant in 1964, performing manual labor and operating and maintaining heavy equipment such as front-end loaders. After twenty years, however, the Tchoupitoulas Street facility was shut down. For approximately one year thereafter, Mr. Harris obtained temporary employment through the Machinists’ Union Local at various companies, including Buck Kreihs Company, Inc. In 1989, Mr. Harris returned to regular, full-time employment at National Gypsum’s facility in Westwego, working from 7:00 a.m. until 3:00 p.m. seven days per week. In addition, he frequently worked night shifts, from 4:30 p.m. until midnight, as an outside machinist at Buck Kreihs when a job was available.
In February 1996, an aortic valve replacement was performed on Mr. Harris’ | «.heart. After six weeks’ recuperation from the surgery, he returned to work at both National Gypsum and Buck Kreihs without restrictions. While periodic checkups have demonstrated essentially normal cardiac functioning since the surgery, Mr. Harris must take Coumadin, an anticoagulant, for the rest of his life.
On October 1, 1997, Mr. Harris suffered an injury to his right hip, thigh and knee while working for Buck Kreihs in the hold of a ship. The employer’s Safety Director, Richard McNeil, referred him to The Occupational Health Center for medical treatment on October 6, 1997, where he came under the care of Dr. Robert L. Mímeles. While the contusions to his hip and thigh soon cleared up, an MRI on October 24th revealed “a complex tear of the medial meniscus” of the right knee, resulting in the recommendation of an arthroscopic surgical repair. However, because he was taking Coumadin, Mr. Harris’ cardiologist would not clear him for surgery “unless it’s an absolutely last resort.” Therefore, in January 1998 Dr. Mímeles reported as follows:
[Mr. Harris] states he cannot do his work the way his knee is but is afraid to have surgery. This gentleman can only do a light duty, sitting-down type of job. I do not think he can do a job where he has to do a lot of bending, stooping or climbing. I’ve taken him about as far as I can. If he is not going to have the surgery, then he has to cope with a torn medial meniscus in this knee unless this gets totally out of hand. He has a knee brace. He has medication and he is discharged to return here only as necessary.
Based upon a 15% permanent-partial disability in the right knee and the expectation of continued conservative treatment, Mr. Harris received a lump-sum settlement under the Longshore and Harbor-workers Act from Buck Kreihs’ insurer. Mr. Harris subsequently returned to Dr. Mímeles for cortisone injections in his right knee and medications in April and. November 1998 and on July 29th and December 30,1999.
| .¡Despite the work restrictions recommended by Dr. Mímeles, Mr. Harris con *742 tinued performing his regular duties at National Gypsum and, when work was available, at Buck Kreihs.[1] The accident at issue here occurred on Sunday, June 6, 1999, when Mr. Harris slipped and twisted his left knee while in the course and scope of his employment at National Gypsum. He completed his shift, but that evening the knee became swollen and quite painful, so the next morning Mr. Harris told his supervisor he would like to see a doctor about it. The supervisor had Mr. Harris complete an Employee Accident Report and said it would be forwarded to the Personnel Director, N.J. Dufrene, who had to approve a referral to the company doctor. On June 22, 1999, when a properly completed form was received from the supervisor, Mr. Dufrene sent Mr. Harris to Westbank Surgical Clinic.
At the clinic, Dr. Samuel Logan examined Mr. Harris and noted a possible “internal derangement” of the left knee. The doctor scheduled an MRI for the next day as well as a followup visit to the Clinic on the 24th, then gave Mr. Harris a form to bring back to his employer showing he should be on light duty until further notice. Mr. Harris returned to National Gypsum and gave the form to Mr. Dufrene, who told him “you might as well go home ... I’ll call you.”
The MRI confirmed that Mr. Harris’ left knee had tears in both the medial and lateral menisci, with a possible “tiny osteo-chondral fracture” and “mild injury of the medial collateral ligament.” Therefore, when Mr. Harris returned to the West-bank Surgical Clinic, Dr. Logan put him on nonwork status and referred him to Dr. Mark Juneau, Jr., a specialist at Jefferson Orthopedic Clinic. After review of the MRI and an examination on June 29th, Dr. Juneau advised that arthroscopic | ¿surgery on the left knee was necessary, but Mr. Harris’ cardiologist again recommended against the procedure. His subsequent conservative treatment has included cortisone injections to the left knee on July 14, August 11, November 29, 1999 and on February 29, 2000.
Dr. Juneau, like Dr. Mímeles, recommended restricted work activity for Mr. Harris, stating that “he cannot climb ladders or do repeated bending and stooping.” In response to an inquiry from National Gypsum’s adjuster regarding the recovery period after surgery, Dr. Juneau stated that “If this patient had surgery he would probably be allowed to return to work two to three weeks after the surgery.” [2] Based upon this information, National Gypsum’s insurer sent Mr. Harris a check for $2,936.00 on September 29, 1999, explaining in the accompanying letter that the payment was for the eight-week period “that you would have been out of work if you were able to have the surgery without problems with your heart condition.” The letter also asked Mr. Harris to contact the Adjuster “regarding possible settlement of the claim for additional medical treatment....”
Mr. Harris subsequently retained an attorney, and this claim for workers’ compensation benefits plus penalties and attorney fees was filed on November 8, 1999.[3] National Gypsum answered on December *743 28, 1999, denying all allegations and further asserting, among other things, that Mr. Harris has no disability, that all medical benefits should be denied or reduced for failure to comply with the proper procedures and reimbursement schedules,[4] and that he had forfeited his right to | ¡jbenefits pursuant to R.S. 23:1208 and 1208.1.
At the trial on March 23, 2000, Mr. Harris testified that after June 29, 1999, he reported to Mr. Dufrene at National Gypsum after each visit to Dr. Juneau and/or Westbank Surgical Clinic. Although he had been cleared for light-duty work, Mr. Dufrene repeatedly told him none was available, so he had not worked since June 22, 1999. When asked on cross examination, “If Buck Kreihs records show you worked for about a month after that, as many as 30, 40 hours a week, you disagree with that?” Mr. Harris answered in the affirmative. However, when asked on redirect about the last time he had worked for Buck Kreihs, Mr. Harris responded that while he thought it was in January 1999, he would have to look at his pay stubs. In addition, when the court questioned him about his ability to work, Mr. Harris stated that there were “low ground” jobs at National Gypsum that he felt he could do.
When cross examined about his medical condition, Mr. Harris agreed that both knee injuries were similar and resulted in similar work restrictions, but that he had not reported the left knee injury to Dr. Mímeles or the right knee injury to Dr. Juneau. Mr. Harris further testified that his right knee does not bother him as much as the left, although the right knee had begun to “pop” on occasion. He stated that whenever either knee begins to bother him, he obtains relief from the injections given by his doctors, and that this relief generally lasts for several months.
Mr. Narcisse “N.J.” Dufrene, National Gypsum’s personnel director, testified that when Mr. Harris returned with Dr. Juneau’s light-duty recommendation, he discussed it the plant manager, who “makes the final call” on such matters. Although there were some employees on light duty at the plant, Mr. Dufrene was told that, “We didn’t have any work to be done with his limitations,” so Mr. Harris l^had not been allowed to work since June 1999. Mr. Dufrene stated that he knew nothing of Mr. Harris’ prior injury to his right knee and, to the best of his knowledge, Mr. Harris had not missed any work because of it.[5]
Richard McNeil, Safety Director at Buck Kreihs, testified that Mr. Harris “received some medical” for a work-related injury at Buck Kreihs, but he had continued to work nights until mid-1999. Mr. McNeil confirmed that the payroll records showed Mr. Harris was last paid on July 20, 1999 for twenty-four overtime hours, which was probably two twelve-hour shifts the preceding weekend. When asked why Mr. Harris no longer worked at Buck Kreihs, Mr. McNeil stated, “He had said his leg was bothering him a little bit more, and that the doctor had advised him not to climb stairs.” He then agreed with defense counsel’s statement that “When he told you the leg, he was referring to his right leg that he hurt at your company.”
*744 Mr. Harris testified on rebuttal that he could not recall working at Buck Kreihs in July 1999, and he would have to check his pay stubs to see if Mr. McNeil’s computer printout was accurate. He reiterated, however, that at that point in time, he would have been working at National Gypsum had they allowed him to do so.
After trial, both parties submitted timely post-trial memoranda. Judgment was rendered on June 8, 2000, decreeing that the injury of June 6, 1999 entitled Mr. Harris to weekly indemnity benefits of $367.00 per week plus interest, subject to a credit for prior payments; that he was also entitled to continued medical benefits as well as vocational rehabilitation services; that the employer had failed [7to controvert the employee’s claim and its failure to pay timely benefits was without probable cause, thus entitling Mr. Harris to the penalties specified in La. R.S. 23:1201 F; and that National Gypsum’s arbitrary and capricious denial of benefits justified an attorney fee award of $8,000.00.
DISCUSSION
In its appeal, National Gypsum first argues that the award of additional indemnity benefits is legally erroneous because under the holdings of Schernbeck v. Argonaut Ins. Co., 212 So.2d 742 (La.App. 4th Cir.1968), Miller v. Roger Miller Sand, Inc., 94-1151 (La.11/30/94), 646 So.2d 330, and Haughton v. Fireman’s Fund American Ins. Cos., 355 So.2d 927 (La.1978), Mr. Harris “is only entitled to benefits for the period of time in which he would have recovered from his injury but for the unrelated heart condition.” The defendant contends that because the pre-existing heart condition was not aggravated or affected by this on-the-job injury, and it is the preexisting condition rather than the knee injury that prevents Mr. Harris from returning to work, the award of continuing benefits represents compensation for a disability that is not work related.
However, National Gypsum’s reliance on the three cited cases is misplaced. In Schembeck, the claimant suffered a com-pensable soft-tissue injury in a work-related car accident followed by a stroke that paralyzed one side of his body. The evidence established both that the stroke was unrelated to the accident and that, but for the stroke, the plaintiff would have recovered from his neck injury within the time period for which compensation had been paid. Based upon this evidence, this court held that no further compensation was due because even if the employee had recovered from the work-related injury, he was nevertheless unable to work due to the stroke. The facts at issue in Schembeck are thus distinguishable from those | ¡^presented here. Mr. Harris’ “heart condition” neither prevents him from working nor limits his activities in any way. More significantly, unlike Mr. Schembeck, the evidence clearly demonstrates that Mr. Harris suffered no accident or disabling event after this work-related accident; he is limited solely by the injury that arose while in the course and scope of his employment with National Gypsum.
This chronological distinction was later emphasized by the Supreme Court in the Haughton case cited by defendant, and was the basis for the court’s finding that the injured employee was entitled to workers’ compensation benefits. In Haughton, treatment of the laborer’s broken leg resulted in the discovery that he had a preexisting bone marrow disorder, multiple myeloma, that caused or contributed to the occurrence of the fracture. While the evidence established that this myeloma subsequently resulted in the claimant’s total disability, it was also shown that despite complete healing of the fracture, he had *745 suffered a 25% residual disability of that leg. The Supreme Court summarized the law and its application to these facts as follows:
If an accident causes a disability from which a workman would have recovered except for further disability produced by a separate, intervening cause, there is no liability for compensation beyond the disability produced by the job connected accident. But here there is no evidence of an intervening cause. Nothing happened to Haughton after the accident except his failure to recover. He did not suffer a new accident or disease. The disease he had when the accident occurred contributed to the injury itself.
When there is an accident and a resulting disability without any intervening cause, it is presumed that the accident caused the disability.... The presumption is not irrebuttable, but its effect is to shift the burden of proof to the defendant. This burden was not enforced by the courts below, and the defendant has failed to prove that Haughton’s accident did not cause his disability.
Haughton, 355 So.2d at 929 (emphasis added; citations omitted). Accordingly, it was held that the claimant was entitled to compensation benefits and the lower 1(¡courts’ judgments to the contrary were reversed.
The facts presented here parallel those in Haughton, and thus support the trial court’s award of benefits in this case. There was no subsequent injury or event that caused or contributed in any way to Mr. Harris’ disability. To the contrary, the evidence clearly demonstrates that despite his prior heart surgery and resultant treatment with Coumadin, Mr. Harris was capable of performing all necessary duties of his employment with National Gypsum until June 1999, when he twisted his knee. Accordingly, under the principles stated in Haughton, he is entitled to workers’ compensation for this injury.
Further support for this determination is found in Miller Sand, National Gypsum’s third cited case. The claimant in Miller Sand fell at work, causing a torn rotator cuff in his shoulder. A few months later he suffered a disabling stroke, unrelated to the on-the-job injury, that prevented the surgical repair of the shoulder. Notwithstanding the Fourth Circuit’s denial of benefits under similar circumstances in Schembeck, which was cited in a footnote, the Supreme Court held that the injured employee was entitled to compensation, stating:
[T]he mere fact that the stroke, and not the work injury, rendered plaintiff totally disabled does not negate the fact that the work injury left plaintiff with some form of disability. While Miller Sand is not required to pay for the increased disability caused by plaintiffs subsequent non-work-related stroke, Miller Sand must pay for the disability caused by plaintiffs work-related fall.
Miller Sand, 94-1151 at p. 6, 646 So.2d at 334-35 (emphasis in original; footnote omitted). Based upon its review of the evidence, the court found that the 73-year-old manual laborer was entitled to supplemental earnings benefits because, even if the effects of the stroke were ignored, his shoulder injury precluded a return to his former occupation.
h ^Applying these principles here, there is neither legal nor factual error in the lower court’s award of workers’ compensation to Mr. Harris. It was uncontradicted that prior to the June 1999 injury, he was not only able to perform his required duties at National Gypsum, but was also able to work additional shifts at Buck Kreihs. However, after the instant on- *746 the-job accident, and without any subsequent intervening event, Mr. Harris was physically unable to climb ladders or do anything that requires repeated bending or stooping. Thus, it is clearly established that it is the work-related knee injury, rather than any effects of the prior heart surgery, that has caused Mr. Harris’ inability to continue in his regular occupation. Therefore, the trial court did not err in awarding continuing indemnity benefits in the amount stipulated by the defendant.[6]
National Gypsum next asserts that the evidence was insufficient to establish that it is the 1999 injury to his left knee, rather than the 1997 injury at Buck Kreihs, that caused Mr. Harris’ disability. In support, defendant emphasizes that Mr. Harris last worked for Buck Kreihs a month after the accident at National Gypsum, leaving after he told the Safety Director, Mr. McNeil, that he was unable to continue due to increasing problems with his right knee. In addition, Dr. Miníeles’ reports in July and December 1999 indicate the right knee was “giving out more frequently” and “has been getting worse though with pain, popping and giving out.” Based upon this evidence as well as the similarity between the two injuries, National Gypsum contends that Mr. Harris failed to prove by a preponderance that he can no longer work because of his left knee rather than his right.
Appellate courts review factual findings of a workers’ compensation judge In subject to the manifest error/clearly wrong standard of review. Seal v. Gaylord Container Corp., 97-0688, p. 4 (La.12/2/97), 704 So.2d 1161, 1164. On review, an appellate court determines whether the factfinder’s conclusions were reasonable in light of the record reviewed in its entirety. Id. at pp. 4-5, 704 So.2d at 1164. “Where there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong.” Id. (citations omitted).
The record in this case fully supports the trial court’s determination that it was the June 1999 injury that resulted in Mr. Harris’ reduced earning capacity. Although he had suffered a tear in the meniscus of his right knee in October 1997, it was uncontradicted that this injury had no effect on his job performance or work attendance at National Gypsum. The medical reports establish that the accident of June 6, 1999 caused a more severe injury to the left knee, involving not only two tears and damage to a ligament but also a possible fracture. Such evidence can reasonably be seen to outweigh Mr. McNeil’s testimony that he believed it was the right knee that caused Mr. Harris to cease working at Buck Kreihs. Accordingly, it was not manifestly erroneous for the fact-finder to conclude that, but for this June 1999 accident, Mr. Harris would have continued his regular employment at National Gypsum.
In the next assignment of error, National Gypsum contends that the failure to find that Mr. Harris had forfeited his right to benefits under La. R.S. 23:1208 was manifestly erroneous. The defendant claims that the following misrepresentations were made: (1) at trial, Mr. Harris denied working for Buck Kreihs after this accident; (2) he told' Mr. McNeil he could no longer work at Buck Kreihs because of his right knee; (3) he did not tell either of his employers about his accidents at 11?the other job, nor did he tell Dr. Mímeles about *747 this subsequent injury, and a form filled out for Dr. Juneau states he had no prior orthopedic injuries; (4) he testified at trial that his right knee gave him no trouble, but Dr. Mímeles’ records show a worsening of symptoms in 1999.
La. R.S. § 23:1208 states in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, ... to willfully make a false statement or representation.
% * # * *
E. Any employee violating this Section shall, upon determination by workers’ compensation judge, forfeit any right to compensation benefits under this Chapter.
Under this statute, forfeiture must be ordered if the employer or insurer proves that a false statement or representation was willfully made for the purpose of obtaining workers’ compensation benefits. Resweber v. Haroil Construction Co., 94-2708, p. 11 (La.9/5/95), 660 So.2d 7, 14. However, because R.S. 23:1208 is a penal statute that must be strictly construed, forfeiture is not required for an inadvertent or inconsequential falsehood. Hernandez v. ESKCO, Inc., 2000-0174, p. 3 (La.App. 4th Cir.11/15/00), 773 So.2d 865, 867, writ denied, 2000-3430 (La.2/9/01), 785 So.2d 824. “[T]he relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits.” Resweber at p. 15, 660 So.2d at 16. The factual determination as to whether all requirements for forfeiture are met will not be reversed if supported by the record. Id. at p. 13, 660 So.2d at 15, 660 So.2d at 15.
In the instant case, the determination that forfeiture was not warranted under La. R.S. 23:1208 is not manifestly erroneous or clearly wrong. There was no testimony suggesting that Mr. Harris’ failure to report both of these separate and | ^distinct injuries to each of the “company doctors” bore any relationship to any diagnosis, treatment or assessment of disability, nor that lack of knowledge of both injuries had any impact on the conduct or rights of either of the two employers. Accordingly, even if the lack of disclosure constituted a misrepresentation, it has no bearing on Mr. Harris’ entitlement to compensation benefits. Moreover, contrary to defendant’s arguments, the record of this case fails to support a determination that Mr. Harris made any false statements, at trial or otherwise, in an attempt to obtain benefits to which he was not entitled. Therefore, National Gypsum’s claim for forfeiture is without merit.
Finally, National Gypsum asserts that the award of penalties and attorney fees is manifestly erroneous because Dr. Juneau stated that Mr. Harris could return to work in two or three weeks if he had surgery. Because this opinion indicated that it was the heart condition rather than the knee injury that caused the disability, the defendant argues that the claim was reasonably controverted, as provided in La. R.S. 23:1201 F(2). National Gypsum further contends that even if penalties were properly assessed, the award of $8,000 in attorney fees is excessive.
However, as noted above, the facts of this case are strikingly similar to those in the Haughton and Miller Sand cases cited by defendant, both of which resulted in the award of benefits, rather than a denial. For example, the facts relevant to the issue of penalties and attorney fees were summarized in Miller Sand as follows:
*748 Neither party disputes that Miller suffered a work-related fall, and the evidence is clear that Miller’s torn rotator cuff resulted from this fall. In fact, there is evidence that one of the reasons Miller’s employment was terminated was because he was no longer able to perform his job as a result of the injuries he sustained in this fall. Additionally, all three medical experts stated that Miller was unable to return to his former occupation, or was significantly disabled, due to his work-related fall alone, ignoring the effects of the stroke. Even Dr. Ford’s testimony assuming surgical intervention estimated that an average |14elderly person would be unable to work for four months after the surgery, and even then would only be able to return to some form of employment. Although confronted with this evidence, defendants failed to pay any disability benefits to Miller. Based on the foregoing, we find that Miller’s right to supplemental earnings benefits has not been reasonably controverted.
94-1151 at p. 11, 646 So.2d at 337.
In this case, as in Miller Sand, National Gypsum never challenged the fact that Mr. Harris twisted his knee on June 6, 1999, nor that this accident caused the internal injuries to the joint that were demonstrated on the MRI. Although Dr. Juneau’s initial report of June 29th stated that Mr. Harris was unable to work until he had surgery, all of the subsequent reports indicated that with ongoing conservative treatment he could continue working if his activities were limited. Thus, the evidence clearly established that while Mr. Harris was previously able to work without restrictions, this on-the-job accident prevented his return to his usual occupation. Nevertheless, National Gypsum neither paid compensation for this ongoing loss of earning capacity nor provided work within the restrictions, insisting instead that any disability resulted from a “heart condition.” Based upon this review, the determination that penalties and attorney fees were warranted is not manifestly erroneous. Moreover, we cannot say that the amounts awarded are an abuse of discretion.
CONCLUSION
For the reasons assigned, the judgment awarding indemnity benefits, penalties and attorney fees is affirmed at defendant’s cost.
AFFIRMED.

. Mr. Harris' W-2 forms from the two companies show total wages of $31,341.44 for 1996, $55,535.86 for 1997, and $49,744.16 for 1998.

. None of the medical records indicate whether Mr. Harris would be restricted or not after he had recovered from the surgery.

.Mr. Harris testified that he also filed for, and was awarded, Social Security disability benefits, but the Westbank Surgical Clinic’s records reflect that his claim for payments under a private disability policy was denied because his injury was work-related.

. Despite this assertion, it was stipulated at trial that National Gypsum had paid all medical expenses incurred in connection with this injury.

. Similarly, Walter Eccles, the union steward at National Gypsum, testified that except for time missed for heart surgery, Mr. Harris always "worked just like everybody else” until his left knee was injured in June 1999.

. National Gypsum stipulated that based upon his average weekly wages of $837.86, Mr. Harris “would be entitled to the maximum compensation rate at this time. His earning capacity is not at issue.”