664 So.2d 1238 (1995)
Willcon B. FONTENOT
v.
TRANS GULF, INC. and Alliance Casualty & Reinsurance Company.
No. CA 95 0342.
Court of Appeal of Louisiana, First Circuit.
November 9, 1995.
*1241 Donald G. Cave, Baton Rouge, for Plaintiff/Appellee, Willcon Fontenot.
Jerome M. Volk, Jr., Kenner, for Defendant/Appellant, Trans Gulf, Inc.
Before LeBLANC, WHIPPLE and FOGG, JJ.
WHIPPLE, Judge.
This is an appeal by Trans Gulf, Inc. and the Louisiana Insurance Guaranty Association (LIGA) from a judgment of the hearing officer, reinstating weekly compensation benefits until plaintiff reaches maximum medical recovery and awarding expenses for reasonable and necessary medical care. For the following reasons, we affirm in part, reverse in part and remand.

FACTS
Plaintiff, Willcon B. Fontenot, worked for Trans Gulf, Inc., as a truck driver.[1] On August 29, 1989, plaintiff was injured when he fell from the chassis of his truck while in the process of hauling a load for Trans Gulf. Plaintiff, who was fifty-four years old at the time of the accident, fell three and one-half to four feet from the chassis to the ground and injured his back, right knee and side. He also sustained a hernia.
On the day following his injury, plaintiff went to the emergency room of Lane Memorial Hospital, where he was examined by Dr. James Wade. Dr. Wade's impression was that plaintiff had sustained a contusion and strain to the right lower abdomen and right groin, a traumatic right inguinal hernia extending into the right testicle and a lumbar strain. Plaintiff continued to see Dr. Wade for approximately three months after the accident, and during that time, continued to have complaints of back and right knee pain. On his October 9, 1989 visit, plaintiff also reported problems with urination and was referred to Dr. Anthony Ioppolo, a neurosurgeon, for a neurosurgical evaluation. Dr. Ioppolo first saw plaintiff on September 25, 1989, and continued to treat him until March of 1990. Throughout his treatment with Dr. Ioppolo, plaintiff continued to complain of back pain, paresthesias on the right side and difficulty with urination. When Dr. Ioppolo first examined plaintiff, he concluded that plaintiff suffered from lumbar radiculopathy and recommended an MRI of the lumbar spine. The MRI was performed on October 11, 1989, and revealed mild degenerative changes at L5-S1, consisting of dehydration and a very slight bulge of the annulus.
*1242 Other diagnostic tests performed at Dr. Ioppolo's request included a CT scan of the brain, which was normal; a myelogram of the cervical, thoracic and lumbar regions, which was essentially normal except for mild degenerative changes in the cervical spine; and a CT scan of the pelvis and a bone scan of the whole body, both of which were normal.
Plaintiff also sought medical treatment from Dr. Robert Rabalais, Jr., an orthopedic surgeon, for both his knee and back complaints. Dr. Rabalais first saw plaintiff on November 3, 1989, and continued to see him through May of 1992, shortly after the termination of plaintiff's worker's compensation benefits. During the course of his treatment of plaintiff, Dr. Rabalais noted that plaintiff complained of his knee "popping" and giving way, but plaintiff's main complaint was back pain.
On December 21, 1989, plaintiff underwent an MRI of the right knee, which demonstrated a definite tear and thinning of the posterior horn of the medial meniscus, a probable horizontal tear of the posterior horn of the lateral meniscus, and poor visualization of the anterior cruciate ligament, which indicated the strong possibility of a tear. On plaintiff's January 10, 1990 visit, Dr. Rabalais discussed arthroscopy with him, but according to Dr. Rabalais' office note, plaintiff was very hesitant to submit to the surgical procedure.
Dr. Rabalais opined that plaintiff had a definite pathology with regard to his hernia and his right knee, and that plaintiff would benefit from a hernia repair and arthroscopic examination of the knee. However, he stated that he was hesitant to perform any surgery on plaintiff without plaintiff first undergoing a psychiatric evaluation because of "sometimes bizarre symptoms." As of February 20, 1991, Dr. Rabalais stated that he did not know what treatment to offer plaintiff at that point, and he suggested that plaintiff consider attending a chronic pain clinic.
On July 23, 1991, plaintiff underwent a Symptom Magnification Syndrome Test at the request of Dr. Rabalais, and tested positive for symptom magnification on all parts of the exam. In his November 13, 1991 office note, Dr. Rabalais stated that he had no basis for understanding some of plaintiff's symptoms except on a psychological basis, inasmuch as they did not fit any physiologic pattern.
However, in his September 4, 1991 office note, Dr. Rabalais also noted that strictly from an orthopedic standpoint, plaintiff was fit only for the most sedentary type of employment. He further opined that as of plaintiff's last office visit in May of 1992, plaintiff was unable to perform the usual duties of his job as a truck driver.
With regard to his problems with urination, Dr. Rabalais referred plaintiff to Dr. Robert Taylor, a urologist. Plaintiff reported to Dr. Taylor that he had experienced transient episodes of inability to void since his August, 1989 work injury. Urodynamic studies revealed that plaintiff had a possible bladder neck obstruction, but Dr. Taylor opined that it would not make sense for a compromised bladder neck to cause plaintiff voiding difficulty only following his work injury.
Regarding his right inguinal hernia, plaintiff was examined by Dr. Howard Martin on April 19, 1991. According to his office notes, Dr. Martin recommended surgery on that visit, but plaintiff was reluctant to undergo surgery because of a pulmonary condition. Dr. Martin saw plaintiff again on September 18, 1991, at which time he recommended to plaintiff that surgical repair of the hernia be performed under local anesthesia. However, plaintiff never underwent the surgery to repair his hernia.
Subsequent to plaintiff's work injury, at some point in 1991, plaintiff developed severe chronic obstructive lung disease for which he was treated by Dr. M. Kemp Amacker. The only information of record concerning Dr. Amacker's treatment of plaintiff consists of a September 13, 1993 report, in which Dr. Amacker states that plaintiff has emphysema, has had numerous bouts of acute bronchitis and demonstrates labored breathing with the least bit of exertion. Dr. Amacker did not give an opinion as to the cause of plaintiff's emphysema in this report. The record also contains a note dated January 28, 1991, from Dr. Dewey Blackwell, a family practitioner, in which he states that plaintiff *1243 is totally disabled from any employment or rehabilitation as a result of his severe combined restrictive and obstructive lung disease.
On September 17, 1991, plaintiff was examined by Dr. Alan Farries, an orthopedic surgeon, at the request of the adjusting service, F.A. Richard & Associates. Following the examination, Dr. Farries opined that plaintiff had a definite pathology involving the right knee, specifically an anterior cruciate ligament rupture as well as possible tear of the menisci. Regarding the lower back, Dr. Farries noted that plaintiff had undergone extensive work-up with no abnormalities noted and opined that plaintiff "greatly exaggerated" some of the findings on physical examination. Dr. Farries also opined that following surgical intervention of the right knee, plaintiff would "probably" be able to return to his former occupation as a truck driver. Without surgical intervention, Dr. Farries opined, plaintiff would have a 15% disability rating, which he doubted would improve. Dr. Farries stated that even if plaintiff wore a knee brace, it was questionable whether he could function as a truck driver in the absence of surgery.
On September 13, 1993, Dr. Randall Lea, an orthopedic surgeon, examined plaintiff at LIGA's request for evaluation of the nature and extent of his injuries. After examining plaintiff on one office visit and reviewing plaintiff's medical records, Dr. Lea opined that plaintiff is totally disabled from employment, but stated that this is due to plaintiff's chronic obstructive pulmonary disease. Dr. Lea stated that he could not, in any way, attribute plaintiff's pulmonary condition to the August 29, 1989 work accident.
With regard to plaintiff's back problems, Dr. Lea opined that plaintiff had probably suffered a strain or sprain of the lumbar spine as a result of the accident. He testified that he could not attribute the degenerative changes in plaintiff's lumbar spine to his work accident. Dr. Lea further stated that no findings on physical exam suggested that plaintiff's strain or sprain was disabling to plaintiff at that time. Thus, he opined that, in the absence of plaintiff's lung disease, plaintiff's back problems would not prevent him from being able to work. Although Dr. Lea opined that no further medical treatment was needed for plaintiff's back, he nonetheless assigned plaintiff a five percent whole person disability rating for his back.
With regard to plaintiff's right knee, Dr. Lea noted that plaintiff had a medial meniscal tear and a lateral meniscal tear, which he felt were causally related to the August 29, 1989 work accident. He stated that because of the lateral meniscal tear, plaintiff may experience giving way of the right extremity, but felt that a knee sleeve may afford plaintiff some stability. Dr. Lea also assigned a four percent whole person impairment rating to plaintiff for his right knee problems. Dr. Lea noted that, in view of plaintiff's emphysema, plaintiff's lung physicians had suggested that it would be difficult for plaintiff to undergo arthroscopic repair of the knee.
With regard to plaintiff's right inguinal hernia, Dr. Lea rendered no opinion as to the cause of the hernia, stating that it was outside of his area of expertise. However, he stated that he would assign plaintiff a whole person disability rating for the hernia of no more than ten percent. Thus, combining his impairment ratings for the back, knee and hernia, Dr. Lea assigned plaintiff an eighteen percent whole person disability rating. He noted that in reality, plaintiff's impairment rating is significantly higher, due to plaintiff's pulmonary condition.
Dr. Lea testified that without the emphysema, plaintiff would still be able to perform sedentary to light employment even in the absence of surgical repair of the knee or further treatment for his back. Dr. Lea further opined that even without surgical repair, plaintiff could return to his previous occupation as a truck driver, although he would have to exercise prudence. Dr. Lea stated that truck driving positions can be classified from almost sedentary to very heavy, depending on the requirements for the particular job. He testified that although plaintiff reported that he was unable to sit for extended periods to drive a truck, he could not find any objective verification of this subjective complaint. Dr. Lea noted that the primary difficulty plaintiff would *1244 encounter would be getting on and off his rig and other climbing type activities.
Dr. Lea also testified that if the knee injury were surgically repaired, generally the patient could expect to return to full function in six weeks, with a liberal estimate of eight weeks. However, he gave no opinion as to the length of time or extent of recovery plaintiff could expect from surgical repair of his hernia.

PROCEDURAL HISTORY
Within a few weeks following his accident, plaintiff began receiving worker's compensation payments in the amount of $267.00 per week from Alliance Casualty & Reinsurance Company (Alliance), plaintiff's worker's compensation insurer. These benefits were discontinued in February of 1992, when Alliance was placed into rehabilitation. On May 7, 1992, plaintiff filed a Disputed Claim for Compensation, naming Trans Gulf and Alliance as defendants. Subsequently, Alliance was ordered liquidated, and plaintiff amended his petition to name LIGA as an additional defendant due to the insolvency of Alliance. As of the hearing date, LIGA had not paid any weekly compensation or medical benefits to plaintiff.
Following trial of this matter, the hearing officer rendered judgment in favor of plaintiff, finding that: (1) plaintiff was injured within the course and scope of his employment and is disabled; (2) plaintiff is entitled to weekly compensation benefits from the time benefits were terminated until he reaches maximum medical recovery; (3) plaintiff is entitled to reasonable and necessary medical care, including bills related to his pulmonary condition; and (4) there had been no overpayment of benefits inasmuch as the method used to compute plaintiff's average weekly wage was correct.
From this judgment, Trans Gulf and LIGA appeal, assigning the following as error:
(1) The hearing officer erred in finding that it was more likely than not that plaintiff's lung condition was brought on by his work-related injuries and that compensation benefits should be reinstated;
(2) the hearing officer erred in failing to find that plaintiff's pre-injury wages and corresponding benefits were miscalculated; and
(3) the hearing officer erred in failing to find that LIGA is owed either a reimbursement or a credit for the overpayment made to plaintiff and for the offset for social security disability benefits received by plaintiff.

ENTITLEMENT TO BENEFITS

(Assignment of Error No. 1)
In this assignment of error, appellants contend that the hearing officer erred in concluding that plaintiff's emphysema was more likely than not related to his work injuries. Appellants further contend that plaintiff's injuries which are related to his work accident are not disabling and that plaintiff accordingly is not entitled to any further benefits.
In reasons for judgment, the hearing officer stated as follows:
The claimant has carried his burden of proof. He was injured on the job and while doing his job. While it is true that [plaintiff's] current disability stems from a pulmonary disorder, it is more likely than not that his lung condition was brought on by the physical and musculoskeletal problems that he experienced.... The evidence showed that [plaintiff] had no pulmonary difficulties before his accident. His injuries, which were substantial, notwithstanding the findings of Dr. Lea, and the emphysema could very well be the result of an intervening but not superseding cause.
An employee in a worker's compensation action has the burden of establishing a causal link between the accident and the subsequent disabling condition. Miller v. Roger Miller Sand, Inc., 94-1151 (La. 11/30/94); 646 So.2d 330, 334. While it is not necessary that the exact cause be found to recover worker's compensation benefits, the plaintiff must establish that his employment somehow caused or contributed to his disability. Martin v. Riverview Medical Center, 618 So.2d 1014, 1017 (La.App. 1st Cir.), writ denied, 623 So.2d 1333 (La.1993).
*1245 When a work-related injury is subsequently exacerbated, the aggravation is regarded as a development of the initial accident. The subsequent off-the-job injury is compensable where it is foreseeable and came about as a result of the work injury having predisposed the worker to future injury. Hanover Insurance Company v. Allstate Insurance Company, 554 So.2d 1261, 1264 (La.App. 1st Cir.1989). However, if an accident caused a disability from which a worker would have recovered except for further disability produced by a separate, intervening cause, there is no liability for compensation beyond the disability produced by the job-related accident. Miller, 94-1151, p. 6 n. 6; 646 So.2d at 334 n. 6; Schernbeck v. Argonaut Insurance Company, 212 So.2d 742, 744-745 (La.App. 4th Cir.1968).
A court of appeal may not overturn a judgment of a hearing officer absent an error of law or a factual finding which is manifestly erroneous or clearly wrong. Before an appellate court may reverse a factfinder's determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong. Kennedy v. Johnny F. Smith Trucking, 94-0618, p. 2 (La.App. 1st Cir. 3/3/95); 652 So.2d 526, 528.
In the present case, the evidence establishes that plaintiff's work-related accident resulted in a hernia and injury to his right knee, back and side. The evidence is also clear that subsequent to the accident, plaintiff developed a severe pulmonary condition, namely emphysema, which worsened plaintiff's condition and rendered him completely and totally disabled. However, the record is devoid of any evidence to indicate that plaintiff's emphysema was related to or caused by his on-the-job injury.
Only one report of Dr. Amacker, the treating physician for plaintiff's emphysema, was introduced into evidence. In the report, Dr. Amacker stated that plaintiff has severe chronic obstructive lung disease, specifically emphysema, and that plaintiff experiences labored breathing with the least bit of exertion as a result of this condition. However, Dr. Amacker gives no opinion as to the cause of plaintiff's emphysema in that report.
The only doctor to render an opinion regarding the causal relationship, or lack thereof, between plaintiff's pulmonary condition and his work accident was Dr. Lea, the orthopedic surgeon who examined plaintiff at LIGA's request. Dr. Lea opined that he could not in any way relate plaintiff's emphysema to the work-related accident. Moreover, plaintiff himself conceded at the hearing that the emphysema was not causally related to his work-related injuries. Finally, there is nothing in the record to suggest that plaintiff's work injury predisposed him to developing emphysema. Therefore, we conclude that the hearing officer committed manifest error in finding that plaintiff's emphysema was causally related to the work accident upon which his claim for compensation benefits was based. Any compensation benefits awarded for plaintiff's emphysema, including medical benefits or temporary total disability benefits, insofar as these were awarded for the disability caused by plaintiff's pulmonary condition, were therefore erroneously awarded.
While defendants are not required to pay for the increased disability caused by plaintiff's subsequent non-work-related emphysema, they are, however, responsible for any remaining disability caused by plaintiff's work-related fall. Therefore, in order to determine if plaintiff is entitled to continuing disability payments, we must determine the extent of his disability caused by the work-related fall, giving no consideration to any additional disability caused by the emphysema. Miller, 94-1151, p. 6; 646 So.2d at 335.
We disagree with appellants' contention on appeal that plaintiff's injuries related to his work accident are not disabling and that plaintiff was not entitled to any further disability benefits. Our consideration of the medical and lay testimony, and the documentary evidence leads us to the conclusion that while plaintiff is not totally disabled as a result of his hernia and knee and back problems, plaintiff has proven his entitlement to supplemental earnings benefits (SEBs).
*1246 The threshold prerequisite to the recovery of SEBs is that the employee's injury resulted in his inability to earn wages equal to ninety percent or more of the wages he was earning at the time of the injury. LSA-R.S. 23:1221(3)(a); Daigle v. Sherwin-Williams Company, 545 So.2d 1005, 1006-1007 (La.1989). The injured employee thus bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. The analysis is necessarily a facts and circumstances one in which the court must be mindful of the jurisprudential tenet that worker's compensation law is to be liberally construed in favor of coverage. Smith v. Louisiana Department of Corrections, 93-1305 (La. 2/28/94); 633 So.2d 129, 132; Daigle, 545 So.2d at 1007.
Once the employee has satisfied this burden, the employer may then preclude an award of SEBs by proving that the employee is physically able to perform work that was offered to him or that was available in the employee's or employer's community or a reasonable geographic location. Peveto v. WHC Contractors, 93-1402 (La. 1/14/94); 630 So.2d 689, 693; Thomas v. Tony's Seafood, Ltd., 633 So.2d 675, 680 (La.App. 1st Cir. 1993), writ denied, 94-0223 (La. 3/18/94); 634 So.2d 856.
Plaintiff's medical records demonstrate that he has continually suffered from back pain since the time of his accident. While the diagnostic testing did not demonstrate a disc injury related to the accident, plaintiff was diagnosed as suffering from a severe lumbar strain. Plaintiff testified that his back pain is so severe that he often needs help getting dressed. He also reported that his back pain is greatly aggravated by any prolonged standing or walking as well as bending or lifting. This testimony was corroborated by his wife, who related in a straightforward manner the problems which her husband has experienced as a result of the accident.
Moreover, all the physicians who treated or examined plaintiff for his knee agreed that plaintiff has a definite knee pathology and disabling condition, specifically a medial meniscal tear, a lateral meniscal tear and a probable anterior cruciate tear. Plaintiff has had episodes of his knee giving way, causing him to fall to the ground, and has continued to experience pain and limited function of the right knee since the time of his accident. Finally, plaintiff suffers from a right inguinal hernia, which is aggravated by bending and climbing. Plaintiff's non-work related emphysema prevents him from undergoing surgical repair of the hernia or right knee under general anesthesia.
Dr. Rabalais, plaintiff's treating physician for both his back and knee problems, opined that, strictly from an orthopedic standpoint, plaintiff was unable to perform his usual duties as a truck driver and was fit only for the most sedentary type of employment.
Dr. Farries, who examined plaintiff at the request of F.A. Richard & Associates, was of the opinion that plaintiff's back condition was not disabling. However, he conceded that without surgical intervention to repair the right knee, it was questionable whether plaintiff could function as a truck driver. Moreover, although Dr. Farries opined that plaintiff would probably be able to return to his former occupation as a truck driver if his knee were surgically repaired, his report contains no opinion as to the extent to which plaintiff's right inguinal hernia is disabling or its effect on plaintiff's ability to return to his former occupation.
While Dr. Lea was also of the opinion that plaintiff's lumbar strain was no longer disabling, we note that he nonetheless assigned plaintiff a five percent whole person disability rating for his back. With regard to plaintiff's right knee, Dr. Lea suggested that a knee sleeve may help prevent plaintiff's knee from giving way and allow plaintiff to perform sedentary to light work. We also note that while Dr. Lea opined that plaintiff could possibly drive a truck even in the absence of surgical intervention for the knee, he admitted that plaintiff would have to exercise prudence and may encounter difficulty with getting on and off his rig, an activity plaintiff would not be able to avoid, and with other climbing type activities.
*1247 Dr. Lea testified that after knee surgery, a patient could expect full function in six to eight weeks. However, we again note that plaintiff's work-related hernia must also be considered in determining whether he can return to his former occupation. Dr. Lea assigned an additional ten percent whole person disability rating to plaintiff for the hernia problem, but he did not give an opinion as to the length of time needed for recovery or the extent of recovery plaintiff could expect from surgical repair of his hernia.
Considering the combined effects of plaintiff's chronic lumbar problems, right knee pathology and right inguinal hernia, we conclude that plaintiff has established by a preponderance of the evidence that his work-related injuries prevent him from earning ninety percent of the wages he was earning at the time of the injury. Thus, the burden shifted to appellants, who did not come forward with information regarding employment offered to plaintiff or available to him in his or the employer's community or in a reasonable geographic region. Accordingly, plaintiff is entitled to supplemental earnings benefits. See Miller, 94-1151, p. 9; 646 So.2d at 336; Peveto, 93-1402, p. 6; 630 So.2d at 693.
In their second assignment of error, appellants contend on appeal that plaintiff's average weekly wage was not correctly determined because of a miscalculation of his pre-injury wages. Thus, we must address this argument before any computation of the amount of plaintiff's SEBs can be made.[2]

PRE-INJURY WAGES

(Assignment of Error No. 2)
Pre-injury wages are calculated in accordance with LSA-R.S. 23:1021(10). Subsections (a) through (c) provide the formulas to be used when an employee is paid on an hourly, monthly or annual basis, while subsection (d) provides the method of calculation when the employee is paid on some other basis. LSA-R.S. 23:1021(10)(a)-(d). Because plaintiff, a truck driver, was paid by each load he hauled, calculation of his pre-injury wages is governed by LSA-R.S. 23:1021(10)(d), which provides that the average weekly wage shall be determined as follows:
Other wages. If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by four; ...
(Emphasis added.)
Appellants argue that plaintiff's "gross earnings" within the meaning of LSA-R.S. 23:1021(10)(d) are not the full $7,620.00 that he received in the twenty-six weeks preceding the accident. Rather, they argue, that plaintiff's expenses for the operation of his truck must be deducted from this figure to arrive at his "gross earnings."
Although subsection (d) refers to "gross earnings," we agree that plaintiff's total receipts from Trans Gulf do not represent earnings. The Louisiana Supreme Court, in Nesmith v. Reich Bros., 203 La. 928, 14 So.2d 767, 769 (1943), recognized that if the furnishing of equipment with which the work is done forms a considerable portion of the service for which the employee is paid, the rental value of the equipment should be deducted from the total amount paid in order to compute the employee's weekly wages. The Third Circuit Court of Appeal followed this approach in Thompson v. Cloud, 166 So.2d 28, 31 (La.App. 3rd Cir.1964), and deducted the value of a power saw furnished by the employee in determining the value of his services as a pulpwood cutter for purposes of calculating compensation benefits.
*1248 Also pertinent to this issue is the following comment found in Malone & Johnson, Workers' Compensation, § 327 in 14 Louisiana Civil Law Treatise 114-116 (1992):
The term "wages" means the amount earned by the employee through his own labor, rather than profits for his enterprising or rental for any equipment he may provide. Where an employee furnishes his own truck or other piece of equipment or provides his own helpers, an adjustment is ordinarily made in arriving at his wage so as to exclude those sums paid by the employer in remuneration for these items.
* * * * * *
A question is raised on these calculations by the 1968 and 1975 amendments to the definition of wages. As noted in the preceding section, the amendments provide for the calculation of an average weekly wage for those paid on a unit basis, and they do so by calling for the use of the "gross earnings" of the individual involved. The obvious question is whetherin the instance of a person who cuts wood and supplies his own truck and sawthe amount to be used is the total earnings figure or only the amount represented by his own labor. To the extent that the total earnings figure is used, items that do not actually constitute the fruit of his labor are included: "rental" of the truck and the saw, or, if one prefers, return on capital.
For several reasons, it is submitted that the amount which would be paid to a person doing similar work who does not supply his own equipment or helpers should continue to be used as the "wage" of a person who does supply equipment or helpers. In the first place, the words "earnings" and "wages" are used in the subsection, and would ordinarily be understood to mean return on labor, not capital....
(Footnotes omitted).
The Second Circuit Court of Appeal, in Herrin v. Georgia Casualty & Surety Company, 414 So.2d 1323, 1328 (La.App. 2nd Cir.1982), agreed with this analysis and concluded that "gross earnings" contemplates the plaintiff's return on labor only, rather than on capital also. See also Vernon v. Aetna Life and Casualty Insurance Company, 442 So.2d 674, 678 (La.App. 1st Cir.1983). In the more recent case of Brown v. Vernon Sawyer, Inc., 25,959, p. 3 (La.App. 2nd Cir. 10/26/94); 645 So.2d 260, 264, the Second Circuit, when faced with the calculation of pre-injury wages of a truck driver, concluded that the truck driver's expenses and any sums he received as compensation for the rental of his truck would not be included as his gross earnings. Based on evidence of the "industry standard" in regard to compensation for a truck driver's labor, the court used twenty percent of the truck driver's gross receipts as the figure for his gross earnings. Brown, 25, 959, p. 3; 645 So.2d at 264.
In the instant case, we conclude that the hearing officer erred in concluding that plaintiff's gross receipts for the twenty-six weeks prior to his accident constituted his "gross earnings." Pursuant to the lease agreement between plaintiff and Trans Gulf, plaintiff leased his truck to Trans Gulf, and he also paid all expenses for the operation of his truck. Thus, plaintiff's gross receipts include payment for the rental value of his truck and the expenses incurred as well as for the value of plaintiff's services as a truck driver. In calculating plaintiff's supplemental earnings benefits, the amount of plaintiff's gross receipts which represent his earnings must be determined.
Diane Alleman, the corporate secretary and treasurer for Trans Gulf who handled the earnings records, testified regarding the method she used to calculate the amount of gross receipts to allocate as "driver pay." First, in calculating the driver's worker's compensation premium, she utilized one-third of the gross receipts as the driver's pay, a percentage which she obtained from her insurance agent. Alleman also testified that she had collected data from owners who leased their trucks to Trans Gulf and hired drivers to actually haul the loads. This data demonstrated that these owners paid their drivers no more than twenty-five percent of gross receipts received by the truck owners.
Despite this evidence which could be used to determine plaintiff's gross earnings, we still are unable to determine the amount of *1249 SEBs to which plaintiff is entitled. A determination of plaintiff's wages pursuant to LSA-R.S. 23:1021(10)(d) requires that plaintiff's gross earnings for the twenty-six weeks preceding his accident be divided by the number of days the employee actually worked during that period. Although plaintiff in his brief states that plaintiff worked 68 days in the twenty-six week period preceding his accident, we find no verification of this figure in the record. In his brief to this court, plaintiff stated that the Employer's Report of Occupational Injury (which he seems to indicate was attached to the deposition of Diane Alleman as well as being introduced at trial as Plaintiff's Exhibit 17) demonstrates that he worked 68 days. However, the Employer's Report of Occupational Injury labelled Plaintiff's Exhibit 17, which is the only copy we find of record, does not list the number of days worked by plaintiff in the twenty-six week period. Without proof of this figure, we cannot calculate plaintiff's average weekly wage and, thus, his average monthly wage.
For this reason, we find that remand of the case to the hearing officer is necessary for the purpose of introduction of evidence limited to the number of days worked by plaintiff. On remand, the hearing officer should also determine plaintiff's gross earnings for the twenty-six week period, in accordance with the views expressed herein, to determine the amount of SEBs to which plaintiff is entitled.

CREDITS AGAINST WORKER'S COMPENSATION PAYMENTS

(Assignment of Error No. 3)
In their final assignment of error, Trans Gulf and LIGA contend that a credit or reimbursement is due for overpayments of benefits, which resulted from the miscalculation of plaintiff's pre-injury wages. Appellants further argue that the hearing officer erred in failing to determine the amount of the offset of plaintiff's worker's compensation benefits that is due as a result of plaintiff's receipt of social security disability benefits.
Turning first to the issue of an offset against social security disability benefits, we note that in written reasons for judgment, the hearing officer stated that "[plaintiff] is entitled to have his [worker's] compensation (minus the social security off-set) re-instated from February, 1992, until he reached maximum medical improvement." However, the judgment awarding benefits is silent as to the social security offset and simply provides that plaintiff is entitled to weekly compensation benefits from the time they were terminated until he reaches maximum medical recovery.
LSA-R.S. 23:1225(A) provides, in pertinent part, as follows:
The benefits provided for in this Subpart for injuries producing permanent total disability shall be reduced when the person receiving benefits under this Chapter is entitled to and receiving benefits under 42 U.S.C. Chapter 7, Subchapter II, entitled Federal Old Age, Survivors, and Disability Insurance Benefits ... provided that this reduction shall be made only to the extent that the amount of the combined federal and worker's compensation benefits would otherwise cause or result in a reduction of the benefits payable under the Federal Old Age, Survivors, and Disability Insurance Act....
(Emphasis added).
As recognized in Garrett v. Seventh Ward General Hospital, 95-0017, p. 7 (La. 9/25/95); 660 So.2d 841, subsection A of LSA-R.S. 23:1225 grants the employer an offset for Social Security disability benefits received by the worker against worker's compensation benefits which the employer is obligated to pay where the employee is receiving worker's compensation benefits for total and permanent disability.[3] Because plaintiff is not entitled to permanent disability benefits under the worker's compensation statute, the offset in section 1225(A) is inapplicable.
*1250 However, in Garrett, the supreme court further held that LSA-R.S. 23:1225(C)(1)(c) also provides an offset to the employer against the employer's worker's compensation obligation for Social Security disability benefits received by the employee. Garrett, 95-0017, pp. 8, 12, 660 So.2d 841. LSA-R.S. 23:1225(C)(1), in effect at the time of plaintiff's accident, provided as follows:
If an employee receives remuneration from: (a) benefits under the Louisiana worker's compensation law, (b) old-age insurance benefits received under Title II of the Social Security Act to the extent not funded by the employee, (c) benefits under disability benefit plans in the proportion funded by an employer, and (d) any other worker's compensation benefits, then compensation benefits under this Chapter shall be reduced, unless there is an agreement to the contrary between the employee and the employer liable for payment of the worker's compensation benefit, so that the aggregate remuneration from (a) through (d) of this Subsection shall not exceed sixty-six and two-thirds percent of the average weekly wages of the employee at the time of the injury.
(Emphasis added.)[4]
Unlike the offset in section (A) of LSA-R.S. 23:1225, the offset in section (C)(1) is not limited to situations in which the employee is receiving permanent total disability benefits, and it establishes a "state ceiling of benefits" to which the employee is entitled. Garrett, 95-0017, pp. 2, 8, 660 So.2d 841. Section 1225(C)(1) is designed to add all the benefits not funded by the employee, and if the combined benefits exceed 66 2/3 percent of the employee's average weekly wage, the employer is entitled to an offset of the excess against its worker's compensation obligation. Garrett, 95-0017, p. 8, 660 So.2d 841.
Therefore, because we are bound to follow the dictates of Garrett, we must conclude that pursuant to LSA-R.S. 23:1225(C)(1)(c), Trans Gulf and LIGA are entitled to an offset for plaintiff's social security benefits, in the proportion funded by the employer, against their worker's compensation obligation to plaintiff. Because the offset in LSA-R.S. 23:1225(C)(1)(c) is not a reverse offset (meaning that it does not take precedence over any federal offset), there is a potential double offset, one state and one federal. Thus, on remand, the hearing officer is to determine the appropriate offset to which Trans Gulf and LIGA are entitled, which cannot reduce plaintiff's combined worker's compensation benefits and Social Security disability benefits below sixty-six and two-thirds percent of his average weekly wage. Garrett, 95-0017, pp. 12-13, 660 So.2d 841.
With regard to a credit for any overpayment of compensation benefits, LSA-R.S. 23:1206 provides as follows:
Any voluntary payment or unearned wages paid by the employer or insurer either in money or otherwise, to the employee or dependent, and accepted by the employee, which were not due and payable when made, may be deducted from the payments to be made as compensation.
This statute entitles an employer to a credit for previous overpayments from future compensation which may be due. Jim Walter Homes v. Lewis, 544 So.2d 485, 495 (La.App. 2nd Cir.1989) (on rehearing); see also Ferrand v. D.H.L. Company, 614 So.2d 350, 353-354 (La.App. 4th Cir.1993). Thus, on remand, the hearing officer should also determine the amount of credit due against future compensation benefits after calculating the amount of SEBs to which plaintiff is entitled.

CONCLUSION
For the above and foregoing reasons, the portions of the May 19, 1994 judgment of the hearing officer awarding plaintiff temporary total disability benefits and payment of medical expenses incurred for his pulmonary condition are reversed and judgment is hereby rendered awarding plaintiff supplemental earnings benefits. The finding of the hearing officer that plaintiff's average weekly wage had been correctly computed is *1251 also reversed. In all other respects, the judgment is affirmed. The case is remanded to the Officer of Worker's Compensation Administration for a determination, consistent with the views expressed herein, of plaintiff's pre-injury wages; the number of days in which plaintiff worked during the applicable period prior to his work-related injury, for calculation of the amount of supplemental earnings benefits to which he is entitled; the amount of offset due defendants for Social Security benefits received by plaintiff; and the amount of credits, if any, for any previous overpayments of compensation.
Costs of this appeal are assessed against defendant Trans Gulf, Inc., and the Louisiana Insurance Guaranty Association.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED; REMANDED WITH ORDER.
NOTES
[1] Pursuant to a "Permanent Lease Agreement" entered into by plaintiff and Trans Gulf, plaintiff leased his truck to Trans Gulf. Plaintiff drove his own truck whenever he carried a load for Trans Gulf and was considered an "owner/operator," rather than an employee. Plaintiff paid his own worker's compensation premiums, which were deducted out of his paycheck by Trans Gulf.
[2] Regardless of the exact amount determined to be plaintiff's pre-injury monthly wages, we still conclude that he is entitled to SEBs because LIGA failed to present any evidence that employment was offered to plaintiff or available to him in his or his employer's community or in a reasonable geographic region. Thus, in calculating the amount of SEBs to which plaintiff is entitled, the figure for the average monthly wages plaintiff is able to earn post-accident must be factored in as zero in making the necessary calculations. His pre-injury wages were obviously greater than zero. See Peveto, 630 So.2d at 693 n. 5.
[3] This offset provision is a "reverse offset" provision, inasmuch as it allows the employer to offset Social Security disability benefits against the worker's compensation benefits it is obligated to pay, and precludes the federal government from implementing a second, double, offset of worker's compensation benefits against Social Security disability benefits. Garrett v. Seventh Ward General Hospital, 95-0017, p. 5 n. 4 (La. 9/25/95); 660 So.2d 841.
[4] This section has been amended twice since the date of plaintiff's accident. The amendment by Acts 1989, No. 454, § 6, effective January 1, 1990, changed the conjunction between (c) and (d) from "and" to "or." The amendment by Acts 1991, No. 469, § 1 eliminated the conjunction entirely. These amendments were merely clarifications of the original legislative intent. Garrett v. Seventh Ward General Hospital, 95-0017, p. 6 n. 6 (La. 9/25/95); 660 So.2d 841.